UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

PENNY SUE Y.[1],                          )
                                          )
                    Plaintiff,            )
                                          )
            v.                            )        No. 2:25-cv-00012-JPH-MKK
                                          )
FRANK BISIGNANO[2], Commissioner of       )
the Social Security Administration,       )
                                          )
                    Defendant.            )

## REPORT AND RECOMMENDATION

Plaintiff Penny Sue Y. requests judicial review of the final administrative

decision of the Commissioner of the Social Security Administration ("the

Commissioner") denying her application for disability insurance benefits ("DIB")

under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423(d). On

June 6, 2025, United States District Judge James Patrick Hanlon entered an Order

referring this matter to the undersigned for a report and recommendation regarding

the appropriate disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 14). Plaintiff

alleges the Commissioner's decision is not supported by substantial evidence and

---

[1] To protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The undersigned has elected to implement that practice in this Report, in both the body and caption.

[2] Frank J. Bisignano became the Commissioner of Social Security in May 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should be substituted for Leland C. Dudek as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

contains legal errors. For the reasons set forth below, the undersigned recommends that the Commissioner's decision denying Plaintiff benefits be **REVERSED** and that the Court **REMAND** this matter for further proceedings.

## I.    PROCEDURAL HISTORY

Plaintiff filed her application for benefits on May 17, 2022, alleging disability beginning January 1, 2021. (Dkt. 9-5 at 2–6, R. 183–87). Her claim was initially denied on September 1, 2022, then again upon reconsideration on June 19, 2023. (Dkt. 9-4 at 8, 14, R. 93, 99). Plaintiff requested a hearing, which occurred before Administrative Law Judge ("ALJ") Jeffrey Ciegel on November 20, 2023. (Dkt. 9-2 at 18, 38, R. 17, 37). At the hearing, Plaintiff, who was represented by counsel, and Vocational Expert ("VE") Julie Dyer testified. (*Id.* at 38, R. 37). In a written decision, the ALJ concluded Plaintiff had not been under a disability, as defined in the Act, since January 1, 2021. (*Id.* at 19, R. 18). The Social Security Administration's ("SSA's") Appeals Council denied Plaintiff's request for review, finding Plaintiff had failed to provide a basis for changing the ALJ's decision. (*Id.* at 2, R. 1). Plaintiff then filed a request for judicial review pursuant to 42 U.S.C. § 405(g).

## II.    LEGAL STANDARD

To qualify for disability, a claimant must be disabled within the meaning of the Act. To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be

of such severity that she is not able to perform the work in which she previously

engaged and, based on her age, education, and work experience, she cannot engage

in any other kind of substantial gainful work that exists in significant numbers in

the national economy. 42 U.S.C. § 423(d)(2)(A).

The SSA has implemented these statutory standards by, in part, prescribing

a five-step sequential evaluation process for determining disability. 20 C.F.R.

§ 404.1520(a)[3]. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant
> has a severe impairment or combination of impairments;
> (3) the claimant's impairment meets or equals any
> impairment listed in the regulations as being so severe as
> to preclude substantial gainful activity; (4) the claimant's
> residual functional capacity leaves h[er] unable to perform
> h[er] past relevant work; and (5) the claimant is unable to
> perform any other work existing in significant numbers in
> the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation

omitted). An affirmative answer to each step leads either to the next step or, at

Steps Three and Five, to a finding that the claimant is disabled. 20 C.F.R.

§ 404.1520; *Briscoe*, 425 F.3d at 352. "If a claimant satisfies steps one and two, but

not three, then [s]he must satisfy step four." *Knight v. Chater*, 55 F.3d 309, 313 (7th

---

[3] The Code of Federal Regulations contains separate, parallel sections pertaining to disability benefits under the different titles of the Social Security Act, such as the one cited here that is applicable to DIB benefits. Often, the parallel section pertaining to the other type of benefits—supplemental security income ("SSI")—is verbatim and makes no substantive legal distinction based on the benefit type. *See* 20 C.F.R. § 416.920(a). Because the statutory references for SSI and DIB claims are substantially similar, the undersigned may reference them interchangeably throughout this opinion.

Cir. 1995). "Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Id.*; *see also* 20 C.F.R. § 404.1520. A negative answer at any point, other than Step Three, terminates the inquiry and leads to a determination that the claimant is not disabled.

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through Step Four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at Step Five. *Id.* The Commissioner must then establish that the claimant—in light of her age, education, job experience, and RFC to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(g).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence and free of legal error. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (internal quotation marks and citations omitted); *see also Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands "more than a scintilla" of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Plaintiff is disabled, "but rather, whether the ALJ's findings were supported by substantial evidence" and free of legal error. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), *as amended* (Dec. 13, 2000); *see also Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("[w]here substantial

evidence supports the ALJ's disability determination, we must affirm the decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'") (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). "Nevertheless, [the Court must] conduct a 'critical review of the evidence' before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citation omitted); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusions," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

## III.    BACKGROUND

### A.    Factual Background

Plaintiff was 46 years old at the alleged onset date. (Dkt. 9-5 at 2, R. 183; Dkt. 9-2 at 30, R. 29). Plaintiff completed four years of college. (Dkt. 9-6 at 5, R. 226). Plaintiff's past relevant work experience included: home restoration cleaner,

home attendant, correction officer, machine cleaner, and hand packager. (Dkt. 9-2 at 29, R. 28).

### B.    ALJ Decision

In determining whether Plaintiff qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a). (Dkt. 9-2 at 19–31, R. 18–30). At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity since January 1, 2021. (*Id.* at 20, R. 19).

At Step Two, the ALJ found the following severe impairments: bipolar disorder, post-traumatic stress disorder, panic disorder, and generalized anxiety disorder. (*Id.*). The ALJ found Plaintiff had the following non-severe impairments: hypothyroidism, hyperlipidemia, gastroesophageal reflux disease, eczema, obstructive sleep apnea, degenerative disc disease of the cervical spine, history of right ovary cyst with uterine fibroids, cyst rectum/coccyx, and obesity. (*Id.* at 21, R. 20).

At Step Three, the ALJ concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.* at 22, R. 21 (considering Listings 12.04, 12.06, and 12.15)). As to the "paragraph B" criteria, the ALJ determined that Plaintiff had a mild limitation in understanding, remembering, or applying information and moderate limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.* at 22–23, R. 21–22). As to the "paragraph C"

criteria, the ALJ determined the Plaintiff had not required systematic medical treatment or a highly structured setting while still having only a minimal capacity to adjust or adapt to daily demands or changes in environment. (*Id.* at 23, R. 22).

After Step Three, but before Step Four, the ALJ found Plaintiff had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:

> the claimant can understand, remember, and carry out simple instructions; use judgment to make simple work-related decisions; cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas, but end of day quotas would be acceptable; could deal with occasional changes in a routine work setting; can engage in occasional interaction with coworkers and supervisors, but no interaction with the public; and would specifically need to avoid team-based activities.

(*Id.* at 23–24, R. 22–23).

At Step Four, the ALJ found Plaintiff had past relevant work as a home restoration cleaner, home attendant, correction officer, machine cleaner, and hand packager. (*Id.* at 29, R. 28). The ALJ concluded that Plaintiff was unable to perform her past relevant work. (*Id.*).

At Step Five, the ALJ concluded that considering the VE's testimony and Plaintiff's age, education, work experience, and RFC, Plaintiff could perform other jobs that existed in significant numbers in the national economy. (*Id.* at 30, R. 28). As such, the ALJ determined Plaintiff was not disabled. (*Id.* at 31, R. 30).

8

## IV.  DISCUSSION

Plaintiff attacks the integrity of the RFC for three reasons: (1) the ALJ inappropriately relied on non-examining state agency opinions over examining medical sources; (2) the ALJ did not analyze the entire record in assessing the RFC and failed to account for all of Plaintiff's conditions; and (3) the ALJ's subjective symptom analysis was "patently wrong" because he improperly relied on his own lay interpretation of Plaintiff's symptoms. (Dkt. 10 at 7–27). The Commissioner responds that the ALJ's decision is supported by substantial evidence, that the ALJ was entitled to give more weight to one medical source opinion than to another, and that the ALJ's analysis provides an adequate logical bridge from the evidence to the conclusion. (Dkt. 13 at 5–18).

### A.  ALJ's Review of Medical Opinions

Plaintiff first argues that the ALJ erred by rejecting the medical opinion of the SSA consultative medical examiner ("CE"), Dr. Torralba-Palanca, in favor of the opinion of the state agency medical consultant, Dr. Mangala Hasanadka, whose opinion was solely based on her review of the medical record. (Dkt. 10 at 8; *see also* Dkt. 9-2 at 28–29, R. 27–28). Dr. Torralba-Palanca examined Plaintiff, considered her medical diagnoses found by her treating providers of hypercholesterolemia, gastroesophageal reflux disease, hypothyroidism, and hypertension, and considered Plaintiff's symptoms of fatigue, nausea, vomiting, diarrhea, left elbow pain, and occasional headaches. The CE doctor also made findings following a physical examination and reviewed Plaintiff's medical record before concluding that Plaintiff

"should be able to walk three to four hours out of an eight-hour day" and that she "could probably carry less than 20 pounds frequently and more than 40 pounds on occasion." (Dkt. 9-7 at 267–269, R. 622–624).

The ALJ found Dr. Torralba-Palanca's opinion "unpersuasive," finding it

> not supported by the doctor's examination record of the claimant which revealed that the claimant had normal gait and was able to walk heel-to-toe, on her heels, on her toes, hop, and squat. She had normal bulk and tone of all major muscle groups and 5/5 strength in the bilateral upper and lower extremities. Range of motion was normal and straight leg raising was negative bilaterally. (Ex. 5F/3). In addition, the opinion is inconsistent with the remainder of the medical evidence, which indicates that the claimant was ambulating normally (Ex. 1F/16) with normal gait and normal movement of all extremities. She had normal motor strength and tone (Ex. 1F/17). Thus, the opinion of Dr. Torralba-Palanca is not supported by the evidence.

(Dkt. 9-2 at 27–28, R. 26–27). However, the ALJ's iteration of the doctor's findings of normal gait, muscle strength and tone *were* consistent with his iteration of these findings in the remainder of the record, a point which the ALJ fails to address. Moreover, Dr. Torralba-Palanca opined that *even with* these normal findings, Plaintiff had the above-mentioned exertional limitations, stating:

> Normal gait. She is able to walk heel-to-toe, on her heels, on her toes, hop and squat. . . . There is normal bulk and tone of all major muscle groups. The claimant has 5/5 strength in the upper and lower extremities with proximal and distal muscle groups. Muscle stretch reflexes are 2+ and symmetrical throughout . . . . normal heel-to-shin testing bilaterally . . . . Range of motion is normal. Negative straight leg raising bilaterally. Fine fingering normal. Gross grip 5/5 bilaterally. . . . Impression: . . . . The claimant should be able to walk three to four hours out of an eight-hour day. She could probably carry less than 20 pounds frequently and more than 40 pounds on occasion.

(Dkt. 9-7 at 268–69, R. 632–24). The treatment record reveals treatment for numbness and tingling in the left arm and both legs with findings of mild neuropathy in the left tibial nerve and a left ulnar motor mononeuropathy. (*Id.* at 347, 366–67, 396–98, 449–51, R. 702, 721–22, 750–53, 804–06). But the ALJ does not address these abnormal findings in his decision to discredit Dr. Torralba-Palanca or explain their conflict with his ultimate conclusions. (Dkt. 9-2 at 20–31, R. 19–30). Instead, the ALJ states that he found the administrative medical findings of the state agency medical consultant, Dr. Hasanadka, persuasive because they were "supported by the doctor's review of the medical record . . . which revealed normal ambulation and gait, full range of motion, and 5/5 strength," the very same motor findings of Dr. Torralba-Palanca. (*Id.* at 28, R. 27). The Commissioner acknowledges that the ALJ did not mention or consider the symptoms or diagnoses Dr. Torralba-Palanca considered when he decided that Dr. Hasanadka's opinions were more persuasive but states that the ALJ was not required "to address every piece or category of evidence" cited by the CE that support her opinion. (Dkt. 13 at 8–9).

The undersigned finds the Commissioner's argument unpersuasive.  "An ALJ need not credit the opinions of the agency's own doctors, but *rejecting* the opinion of an agency's doctor that supports a disability finding is unusual and can be expected to cause a reviewing court to take notice and await a good explanation.'" *Jones v. Saul*, 823 F. App'x 434, 439 (7th Cir. 2020) (internal quotations and citation omitted). In general, SSA agency doctors are "unlikely to exaggerate an applicant's

11

disability." *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013). "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Jones*, 823 F. App'x at 439 (quoting *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018)). When an ALJ prefers one opinion over another, he must provide a valid explanation for doing so. *See Beardsley v. Colvin*, 758 F.3d 834, 839–40 (7th Cir. 2014) (ALJ's finding a non-examining CE's opinion more consistent with the record and therefore more persuasive than the examining CE opinion not supported by substantial evidence when no legitimate reason was provided for rejecting the examining CE's opinion).

In her hearing testimony, Plaintiff testified to feeling fatigue and tiredness throughout the day, spending about 8 hours during the day in bed, being unable to walk more than a half block before getting tired, and having difficulty lifting more than 15 pounds. (Dkt. 9-2 at 60–61, R. 59–60). Her medical treatment records show treatment for complaints of fatigue, (Dkt. 9-7 at 347, 357, 366, 384, 389, R. 702, 712, 721, 739, 743), numbness and pain in the left elbow and arm, (*id.* at 347, 366, 384, 389, 397, R. 702, 721, 739, 743, 750), headache, (*id.* at 366, 384, 389, R. 721, 739, 743), and loose stools two to three times per day (*id.* at 366, 370, 384, 389, R. 721, 725, 739, 743). Dr. Hasanadka's opinion and review of the medical records does not mention these medical conditions. (Dkt. 9-3 at 2–4, R. 69–71). Nor does the ALJ explain why Dr. Hasanadka's opinion is more persuasive than that of Dr. Torralba-Palanca given that these aspects of Plaintiff's medical condition were not discussed in the former's opinion. In sum, the ALJ did not provide a sufficient explanation for

concluding that the state agency opinion is "persuasive" while the opinion of the SSA CE is "unpersuasive." The undersigned struggles to trace a path between the evidence and the ALJ's conclusions. And because the ALJ's reliance on Dr. Hasanadka's opinion informed his formulation of the RFC, the undersigned finds that remand is warranted.

### B.    The ALJ's Accommodation of Plaintiff's Impairments

Plaintiff next argues that the RFC did not properly account for all her limitations. (Dkt. 10 at 11–24). Plaintiff asserts that the ALJ mischaracterized the evidence as it relates to her medical and mental conditions, resulting in a flawed RFC. (*Id.* at 11, 25). Plaintiff contends that the ALJ "cherry picked" evidence from the record and failed to consider all relevant evidence, including her medical history, recorded observations, and longitudinal reports regarding her limitations. (*Id.* at 17–18). The Commissioner responds that "in formulating Plaintiff's RFC, the ALJ provided a narrative discussion of the medical and nonmedical evidence . . . . [H]is decision more than met the 'minimal articulation' standard." (Dkt. 13 at 4–5 (citing *Elder*, 529 F.3d at 415)).

The Seventh Circuit has defined the RFC as "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from her impairments." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). It is the most the claimant can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). When determining the RFC, the SSA Regulations and Seventh Circuit case law make clear that an ALJ's RFC assessment must incorporate all of a

claimant's functional limitations supported by the medical record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *see also Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (citing *Varga* for same proposition); *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) ("When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment").

In making a disability determination, the ALJ relies on the entire record, including the medical opinions of treating physicians who normally have greater familiarity with the claimant's conditions and circumstances. *See Lanigan v. Berryhill*, 865 F.3d 558, 564 (7th Cir. 2017). In his narrative summary of Plaintiff's medical treatment for her mental health conditions, the ALJ mentioned the subjective symptoms that Plaintiff displayed in her medical consultations and the findings on the mental status examination but often neglected to mention the medical professional's final assessment and treatment recommendations—the objective medical opinion. The Court begins by summarizing the ALJ's selective consideration of Plaintiff's medical progress and mental health condition.

### 1.    *ALJ's Review of Plaintiff's Medical Records*

In his assessment, the ALJ stated, "In April 2021, the claimant advised she was taking CNA classes which were to begin the next day. She advised 'I want to be the person I used to be with the good work ethic.'" (Dkt. 9-2 at 25, R. 24). However, the ALJ neglected to mention that during that same examination, Plaintiff complained, "[l]ast night, I was up all night, I haven't been feeling great, . . . I still

14

have [depression], I try to be more positive, and anger . . . . Anxiety thru the roof, still worrying" and stated that she had started picking, stating that "[i]t hurts, but there is some relief in the pain." (Dkt. 9-7 at 91, R. 446). In assessing Plaintiff's mental health condition from that visit, the medical provider concluded that Plaintiff's mood was unstable, doubled the dose of her lithium, and recommended that she increase the frequency of her behavioral therapy sessions to more than monthly. (*Id.* at 91, 93, R. 446, 448).

The ALJ's decision neglected to mention that Plaintiff suffered lithium toxicity in May 2021 as a result of the prescribed higher dose to treat her unstable mood and was subsequently started on Vraylar instead. (*Id.* at 95, R. 450; Dkt. 9-2 at 25, R. 24). Instead, the ALJ skipped from the limited summary of her positive symptoms in April 2021 to a narrative of her visit in June 2021 that states:

> In June 2021, the claimant advised she was 'antsy, shaky on the inside. I want to sleep all the time. Anxious and depressed.' She advised she was taking her medicine as prescribed and had experienced no allergic reactions or side effects. She was only getting therapy once a month and was encouraged to schedule more therapy (Ex. 2F/83). Her chart noted that she was prescribed Caplyta for mood. She had previously been prescribed hydroxyzine for panic attacks and was taking the medication as prescribed. She was taking Zoloft for depression and propranolol for anxiety, of which both conditions had been deemed stable, with the claimant at goal, and the medications continued. She was advised to follow-up in 4 weeks. When examined, she was attentive and oriented to person, place, and time. She reported her mood as "depressed and anxious." Her behavior was good. She had poor impulse control, normal speech, good cognition, and concentration, and an organized and concrete thought process (Ex. 2F/85). Her insight and judgment had improved (Ex. 2F/86).

(Dkt. 9-2 at 25, R. 24). In this narrative, the ALJ failed to mention that she was actually seen twice that month because of restlessness, resulting in the provider's decision to decrease the Vraylar at the first visit. Nor did he mention that the decrease in Vraylar—done in an effort to help the restlessness—resulted in worsening of the unstable mood, prompting the provider to switch Plaintiff to Caplyta at the second visit in June. (*Id.*; Dkt. 9-7 at 101, 105, R. 456, 460).

The ALJ decision stated, "[i]n July 2022, the claimant reported working at the Pizza Villa one day a week. She expressed problems in just getting up and going in." (Dkt. 9-2 at 26, R. 25). A review of the records reveals that Plaintiff reported that she had started working at Pizza Villa one day a week in May 2022, a visit not referenced by the ALJ. (Dkt. 9-7 at 296, R. 651). In the July 2022 visit, Plaintiff reported having been "sick a lot, . . . . I am so anxious, with being sick, and worrying about Curt[, her husband], . . . . He has kidney stones. Living in the city in Jasonville, I should be grateful, I miss the country. Irritability it wears me out." (*Id.* at 300, R. 654). The ALJ did not mention that the medical provider assessed Plaintiff's depression during this visit as worse and increased her depression medication, noting that Plaintiff's "father died, [she] moved to town, [and she] quit her job" were triggers for, and features of, the worsening depression. (*Id.* at 302, R. 657). Nowhere in the ALJ's decision did he mention that Plaintiff quit the one day a week job at the Pizza Villa less than 2 months after she started it or that her symptoms worsened when she faced the life changes and stressors of death of a

parent, moving from the country to the city, her own illness, and her husband's illness.

The ALJ also did not mention that Plaintiff was seen again in August 2022 for medical treatment of her mental health condition, where the provider concluded that her "depression continues," that her "anxiety continues," and that she had worsening irritability that manifest as "angry outbursts" for which the provider added Rexulti to her medical treatment and recommended that she increase her behavioral therapy visits. (*Id.* at 306, R. 661). Also omitted from the ALJ's narrative summary of Plaintiff's mental health treatment was a visit with the mental health provider in September 2022, where the provider noted that the depression, anxiety, and irritability continued and increased the dose of Rexulti to further help with the irritability. (*Id.* at 311, R. 666).

The ALJ's narrative summary of Plaintiff's mental health treatment skips from July 2022 to October 2022. (Dkt. 9-2 at 26, R. 25). In the summary of the October 2022 narrative, he states:

> In October 2022, she complained of trouble sleeping, anxiety, and bad dreams. She advised she was taking her medication as prescribed and was not experiencing any allergic reactions, side effects, involuntary movements, suicidal or homicidal ideation, hallucinations, paranoia, or delusions (Ex. 7F/38).

(*Id.*). These are all subjective symptoms. The ALJ did not reference any of the objective findings from that visit. A review of the record reveals the provider concluded that Plaintiff's depression and anxiety continued and that her internal anxiety had increased. (Dkt. 9-7 at 315, R. 670). The provider lowered Plaintiff's

Caplyta—which had been prescribed to manage her unstable mood—to treat the increased internal anxiety and recommended that Plaintiff increase the frequency of behavioral therapy. (*Id.*). The provider also recommended that Plaintiff follow up in two weeks. (*Id.*).

The ALJ casually stated, "the claimant continued with outpatient treatment throughout 2023. In January 2023 . . . . Her internal anxiety, skin picking, and irritability were at baseline, and she was advised to continue all her medications. She was advised to follow-up in 12 weeks." (Dkt. 9-2 at 26, R. 25). Left out of this narrative was that the depression and anxiety were assessed as "continu[ing]" and the Caplyta was again lowered because of internal anxiety by the medical provider at the two-week follow-up appointment in November. (Dkt. 9-7 at 321, R. 676). Nor did the ALJ mention that when the Caplyta was decreased to help the internal anxiety, the irritability increased necessitating an increase in the Rexulti, or that the depression and anxiety continued four weeks later at the December 2022 mental health visit. (*Id.* at 326, R. 681).

The ALJ decision's only reference to Plaintiff's complaints of frequent diarrhea was the following statement: "In May 2022, the claimant presented for treatment for headaches and diarrhea." (Dkt. 9-2 at 22, R. 21). In her hearing testimony, however, Plaintiff stated that one of the "biggest thing[s] that keeps [her] from being able to, not only get a job now, but to continue to maintain it [is] problems with [her] stomach, . . . the irritable bowel syndrome" in addition to her bipolar and PTSD. (*Id.* at 52, R. 51). Because of her irritable bowel syndrome, she

18

stated that she often will need to "stop what [she's] doing and go use the bathroom," stating that she will have urgent bowel movements three to four times during the workday, sometimes resulting in incontinence if she cannot get to the bathroom in time. (*Id.* at 52, 59, R. 51, 58). The record shows that Plaintiff was diagnosed with irritable bowel syndrome in June 2019. (*See, e.g.,* Dkt. 9-7 at 346, R. 701). The record also shows Plaintiff complained to her medical providers about diarrhea at several medical treatment visits. (*See, e.g., id.* at 5, 17–18, 137, 366, 370, 384, 386, 389, 467–68, R. 357, 372–73, 492, 721, 725, 739, 741, 744, 822–23). The ALJ's decision does not list irritable bowel syndrome as one of Plaintiff's non-severe impairments (a conclusion that Plaintiff does not challenge). (Dkt. 9-2 at 21, R. 20). Nevertheless, such symptoms of bowel incontinence should be considered in the ALJ's formulation of the RFC. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (holding bowel and bladder incontinence must be considered when determining whether an applicant is disabled). The ALJ's brief mention of Plaintiff being treated for diarrhea once vastly understates the evidence of record, further undermining the integrity of his analysis.

Though the ALJ need not address every piece of evidence in articulating his decision, he also may not ignore entire lines of contrary evidence. *Arnett*, 676 F.3d at 592. Here, the ALJ's description of Plaintiff's medical and mental conditions do not give a clear picture of the extent of her disease, the waxing and waning of its severity, or the difficulty the mental health provider had in managing her disease with medications. It is difficult for a reviewing court to understand, much less

accept, the ALJ's reasoning when he downplays the extent of a claimant's treatment. *See Moy v. Bisignano*, 142 F.4th 546, 556–57 (7th Cir. 2025) (finding a claimant's willingness to take heavy doses of strong medications indicative of the credibility of his or her complaints and the physician's willingness to prescribe them an indication that they believe claimant's symptoms are real). When an ALJ minimizes the extent of a claimant's treatment, he risks overlooking evidence that bears on her residual ability to work. *Id.* at 557. Because the ALJ appears to have overlooked such evidence in the record here, the undersigned finds the resulting RFC to be unsupported by substantial evidence.

### 2.    *The ALJ's Findings*

After reviewing this record, the ALJ found that Plaintiff had: (1) a mild limitation in understanding, remembering, or applying information; (2) a moderate limitation in interacting with others; (3) a moderate limitation in concentrating, persisting, or maintaining pace; and (4) a moderate limitation in adapting or managing herself. (Dkt. 9-2 at 23, R. 22). Plaintiff does not challenge these findings, but rather the extent to which the ALJ accounted for them in determining the RFC. (Dkt. 10 at 11–24). More specifically, Plaintiff alleges that the ALJ failed to adequately support his RFC findings pertaining to: (1) occasional changes in a routine work setting; (2) occasional interaction with coworkers and supervisors but no interaction with the public and a need to avoid team-based activities; and (3) simple instructions.

Plaintiff claims that the ALJ failed to comply with Social Security Ruling ("SSR") 96-8P in that he neither described "how the evidence supports *each* conclusion" he reached when constructing the RFC nor built an accurate and logical bridge when doing so. (Dkt. 10 at 12 (quoting SSR 96-8p) (emphasis added by Plaintiff)). The Commissioner responds that Plaintiff fails to show how the record compels a finding of greater functional limitations than was found by the ALJ in the RFC determination. (Dkt. 13 at 9).

### a.    *Occasional Changes in Routine Work Setting*

Plaintiff first asserts that the ALJ's assessment that she could "deal with occasional changes in a routine work setting" was inconsistent with his finding that she had a moderate limitation in adapting or managing herself. (Dkt. 10 at 13; *see also* Dkt. 9-2 at 23–24, R. 22–23). Plaintiff states that the RFC did not adequately account for her inability to handle stress at the workplace. (Dkt. 10 at 13). The Commissioner argues that neither the CE psychologist, Dr. Steven L. Marlow, nor the state agency psychologists found that Plaintiff had greater limitations, stating "Dr. Marlow still opined that Plaintiff 'handled changes in her work environment averagely'" and that the state agency psychologists opined that Plaintiff could "manage the stresses involved with detailed work-related tasks." (Dkt. 13 at 11; *see also* Dkt. 9-7 at 273–74, R. 628–29; Dkt. 9-3 at 18, R. 85; Dkt. 9-2 at 28, R. 27).

The court will "uphold . . . an ALJ's decision if the evidence supports the decision and the ALJ explains [the] analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett*, 676 F.3d at 591–92. The ALJ

21

interpreted the state agency CE opinions as indicating that Plaintiff "manage[s] the stresses involved with detailed work-related tasks," and found these opinions persuasive. (Dkt. 9-2 at 28–29, R. 27–28). As it relates to the determination that Plaintiff could tolerate "occasional changes in a routine work setting," the undersigned finds that the ALJ's decision is supported by substantial evidence in the record and that the ALJ provided an adequate bridge between the evidence in the record and this determination.

### b.    *Interacting with Others*

Next, Plaintiff challenges the ALJ's assessment regarding her ability to interact with others. The RFC restricted Plaintiff to "occasional interaction with coworkers and supervisors, but no interaction with the public; and [she] would specifically need to avoid team-based activities." (Dkt. 9-2 at 27, R. 26). Plaintiff states that these "RFC restrictions are not consistent with the opinion of *any medical source*" and the term "*occasional* interaction" does not address the depth or length of interactions Plaintiff can handle. (Dkt. 10 at 16–17 (emphasis in original)).

The CE psychologist opined Plaintiff "has poor social interactions . . . . She did not get along with her co-workers. She got along poorly with her supervisors. She gets along okay with the general public." (Dkt. 9-7 at 273, R. 628). The ALJ summarized this opinion as indicating she has "poor social interactions." (Dkt. 9-2 at 28, R. 27). The state agency psychologists opined,

> It appears that claimant would be able to manage occasional contact with the public but sustained, intensive, interpersonal contact would be precluded. The claimant would appear to work best alone, in semi-isolation from

22

others or as part of a small group. Totality of the MER
suggests the claimant seems to be able to maintain at least
a minimal level of relationship with others.

(Dkt. 9-3 at 7, 18, R. 74, 85). The ALJ echoed these statements in his decision. (Dkt.
9-2 at 28–29, R. 27–28).

Plaintiff asserts that evidence of her poor social interactions and her getting

along poorly with supervisors should have prompted the ALJ to add limitations as

to the depth and length of social interactions that she can handle. (Dkt. 10 at 17).

The Commissioner responds that the ALJ considered all the evidence in

determining this limitation, and in so doing was entitled to find more restrictive

limitations than the state agency and CE psychologists. (Dkt. 13 at 12). The

Commissioner further asserts that by making an RFC finding that precludes

interaction with the public, the ALJ's assessment was consistent with Plaintiff's

subjective reports that she was antisocial, "feels people hate her," and had daily

panic attacks. (*Id.*).

Where there is no medical opinion that indicates the need for a qualitative

limitation on interpersonal interactions, the ALJ is not required to impose such a

limitation nor explain his decision not to do so. *See Reynolds v. Kijakazi*, 25 F.4th

470, 474 (7th Cir. 2022) (finding an RFC of "occasional interactions with supervisors

and coworkers but no interaction with the general public" consistent with a CE

opinion that claimant could handle "brief supervision and interactions with

coworkers in a work setting" and rejecting claimant's assertion that the RFC should

have been limited to "superficial" interactions with supervisors and coworkers

because of findings of aggressive, violent behavior, difficulty managing emotional responses to frustration, and being easily angered and annoyed). The medical opinions on which the ALJ relied placed qualitative limitations on Plaintiff's interactions with the public, and the ALJ responded by limiting her RFC to no interaction with the public. These same medical opinions *also* placed qualitative limitations on Plaintiff's interactions with supervisors and coworkers to working "alone, in semi-isolation from others or as part of a small group" with a "minimal level of relationship with others." (Dkt. 9-2 at 28–29, R. 27–28; *see also* Dkt. 9-3 at 7, 18, R. 74, 85). The ALJ's limitation of occasional interactions with coworkers and supervisors and the avoidance of team-based activities indicates the ALJ considered these medical opinions in fashioning the RFC. Unlike *Reynolds*, where there was no medical opinion that placed a qualitative limitation on the claimant's social interactions with co-workers and supervisors, here, the very opinions on which the ALJ relied *did* place such a limitation; and the ALJ's decision places parallel limitations. The undersigned, therefore, finds that the ALJ's RFC assessment as it relates to interacting with others is supported by substantial evidence.

### c.    *Simple Instructions*

Plaintiff next challenges an alleged inconsistency between the ALJ's assessment that she requires no off-task time or extra breaks, that she can "understand and remember simple instructions," and her moderate limitation in concentrating, persisting, and maintaining pace. (Dkt. 10 at 18–24). The RFC specifically states that Plaintiff "cannot perform work requiring a specific

24

production rate such as assembly line work or work that requires hourly quotas, but end of day quotas would be acceptable." (Dkt. 9-2 at 23–24, R. 22–23). The RFC does not pose restrictions allowing for off-task time or partial or complete absences from work, and the ALJ's decision is silent as to whether those limitations were considered as being necessary. (*Id.* at 20–31, R. 19–30).

At the hearing, the ALJ asked the VE whether jobs exist in the national economy for an individual with the RFC in question if the worker needed to show up late, leave early, or miss the entire day from work unexpectedly twice monthly. The VE stated no jobs would exist in the national economy under such circumstances. (*Id.* at 65–66, R. 64–65). Subsequently, Plaintiff's counsel asked the VE if an individual with these same RFC limitations needed to be off task 15 to 20% of a workday whether any jobs would exist, and the VE said no. (*Id.* at 66, R. 65).

Plaintiff argues that the ALJ's failure to explicitly address off-task time necessitates remand. She maintains that the ALJ did not adequately consider her history of absences at previous jobs, her issues managing stress and anxiety, her difficulties with concentration, or her frequent stools that require her to use the bathroom three or four times a day in assessing the need for work-preclusive off-task time. (Dkt. 10 at 19; Dkt. 15 at 12; *see also* Dkt. 9-2 at 52, 59 R. 51, 58). Plaintiff also asserts that the ALJ's determination that she "cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas, but end of day quotas would be acceptable" is internally inconsistent. (Dkt. 10 at 23; *see also* Dkt. 9-2 at 27, R. 26).

The Commissioner responds that neither the SSA CE nor the state agency psychology CEs opined that Plaintiff required work-preclusive time off task. (Dkt. 13 at 14). The Commissioner further states that the limitations restricting production rates and hourly quotas were supported by the medical evidence and that the ALJ "was not required to make a finding about off-task time or absenteeism in the RFC." (*Id.* at 15–16). The Commissioner did not address the argument that an end of the day quota is internally inconsistent with a lack of production rate or hourly quotas.

As previously discussed, the ALJ's decision does not completely capture nor characterize the extent, severity, or variability of Plaintiff's mental health conditions and their effects on her daily functioning as reflected in the record as a whole. The ALJ's decision does not discuss the issue of the frequent bowel movements or how the objective evidence relates to Plaintiff's description of how it interrupts her workday and requires her to be off task several times a day. (Dkt. 9-2 at 20–31, R. 19–30). Nor does the ALJ's decision address Plaintiff's statement that she misses work on average five days a month because of her health conditions and how that relates to the objective evidence in the record—of monthly or biweekly visits with the mental health provider and additional visits with the behavioral therapist during the month—or his RFC determination. (*Id.* at 20–31, 57, R. 19–30, 56).

An "RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in

concentration, persistence or pace." *Crump*, 932 F.3d at 570 (internal citations omitted). When a VE opines that a claimant would need to stay on task for a certain percentage of the day or have minimal tardiness with the RFC limitations articulated by the ALJ for there to exist available jobs in the national economy, the ALJ is required to address evidence that shows that the claimant either can or cannot meet these benchmarks. *See Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021). Additionally, where the record contains evidence of additional limitations, such as a need for frequent breaks, the ALJ is obliged to consider these limitations in a manner that allows a reviewing court to ascertain that these factors were considered. *See id.* at 1235. Here, the ALJ's decision lacks any discussion of his assessment that Plaintiff has no need for partial or total absences from work or for off-task time during the workday. The ALJ may well have decided after reviewing the evidence that no work-preclusive off-task time limitations were warranted based on the record, but he was required to explain why. *See Kelli M. v. Saul*, No. 1:20-cv-01731-DLP-JRS, 2021 WL 4236802, at *7 (S.D. Ind. Sept. 17, 2021); *see also Lothridge*, 984 F.3d at 1233 ("we cannot uphold an administrative determination that failed to explain the outcome adequately"). The ALJ's decision, therefore, does not provide an adequate bridge between the evidence and his conclusions.

The Seventh Circuit has repeatedly cautioned that "someone with problems concentrating might not be able to complete a task consistently over the course of a workday, no matter how simple it may be." *Id.* at 1233 (quoting *Martin v. Saul*, 950 F.3d 369, 373-74 (7th Cir. 2020) (collecting cases)). "When an ALJ determines that a

claimant has moderate limitations in concentration, persistence, or pace, and then assigns work that is simple and routine, the ALJ's decision must contain some rationale to explain how the simple work restriction accommodates the claimant's particular limitations." *Dawn F. v. Saul*, No. 1:20-cv-01374-RLY-DLP, 2021 WL 4445002, at *17 (S.D. Ind. Sept. 8, 2021), *report and recommendation adopted*, 2021 WL 4441529 (S.D. Ind. Sept. 28, 2021) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010)). Because the ALJ found that Plaintiff had various psychological limitations and a moderate limitation in concentrating, persisting, and maintaining pace, he was also required to explain how the restrictions in his RFC accommodated those limitations. *See Bruno v. Saul*, 817 F. App'x 238, 242 (7th Cir. 2020) (noting that "[t]he concern is that [restrictions such as "simple, repetitive tasks are] used as a one-size-fits-all solution without delving into an individualized assessment of the claimant's specific symptoms"). Without such an explanation, the Court is unable to trace the ALJ's reasoning.

Further, a determination that a claimant has moderate limitations in concentrating, persisting, or maintaining pace and an RFC that the claimant can work at a consistent production pace does not reflect any level of functional limitation and lacks a logical bridge between the noted limitations and the RFC conclusion. *See Moy*, 142 F.4th at 549, 552. In this case, the RFC contains functional limitations in production pace and rate that are consistent with the moderate limitation in concentration, persistence, and pace. However, the finding that an end of the day quota would be acceptable appears internally inconsistent with this

28

limitation. "An internally inconsistent opinion by an ALJ . . . fail[s] to build a logical bridge between the evidence and the result" and cannot be upheld. *Lothridge*, 984 F.3d at 1233–34. Here, the ALJ did not bridge the gap and articulate how the evidence supports end of the day production quotas when Plaintiff's moderate limitation in concentration, persistence and pace precludes her from work that requires a specific production rate or hourly quotas. Therefore, the undersigned concludes that this RFC determination is flawed and recommends remand.

### C.    Subjective Symptom Analysis

Although the undersigned has found sufficient support to recommend remand on the basis of Plaintiff's first two arguments, a brief discussion of her final argument is warranted for the sake of completeness. Plaintiff argues that the ALJ's subjective symptom analysis is flawed because the ALJ "improperly overlooked, mischaracterized, and rejected evidence that supports Plaintiff's statements." (Dkt. 10 at 24). The Commissioner responds that Plaintiff's testimony regarding needing to use the bathroom three or four times a day, occasional fecal incontinence, and vomiting monthly to quarterly does not allege disabling limitations, and states that the ALJ "was not required to articulate his consideration of every piece of evidence in the record." (Dkt. 13 at 17). The Commissioner further argues that the ALJ addressed her allegations of extreme sitting, standing, and walking limitations in his review of Dr. Torralba-Palanca's medical opinion. (*Id.*). The Commissioner admits that the ALJ did not acknowledge some of Plaintiff's limitations in her activities of daily living but responds that the evidence does not demonstrate that

the ALJ's evaluation was "so 'patently wrong' as to warrant reversal." (*Id.* at 17–18 (quoting *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021)). The undersigned disagrees with the Commissioner on this point.

As previously discussed, the ALJ's decision does not completely capture nor characterize the extent, severity, or variability of Plaintiff's mental health conditions and their effects on her daily functioning as reflected in the record as a whole. In his subjective symptom analysis, the ALJ states that "claimant's statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Dkt. 9-2 at 25, R. 24). The ALJ mentions that Plaintiff can perform personal grooming tasks without difficulty or assistance; that she prepares her own meals, cleans, and launders; that she can drive and go out alone; she shops in stores and can pay bills, handle a savings account, and use a checkbook; and that she listens to music, watches television, and plays on her phone daily. (*Id.* at 24, R. 23). However, the ALJ does not include in his narrative the qualifications as to *how* she handles these activities. For instance, both Plaintiff and her husband stated that she needs constant reminders that her medications are very important to take and that she needs them. (Dkt. 9-6 at 39, 47, R. 261, 269). They both stated that she prepares her meals sometimes but often gets too tired to do so. (*Id.*). Her husband noted that usually, she prepares meals only two or three times a week. (*Id.* at 39, R. 261). When she does so, it can take her an hour or two to finish preparing a meal. (*Id.*). Sometimes it takes her an hour to do household chores, sometimes it takes her

all day to do them, depending on her mood. (*Id.*). Further, her husband observed that though Plaintiff spends most of her day watching television, she sometimes gets lost in her thought while watching and ends up not really watching it. (*Id.* at 41, R. 263). Plaintiff acknowledges, and her husband concurs, that she is antisocial and that her social interactions are primarily limited to interacting with her husband because she often feels people plot against her, including family members. (*Id.* at 41–44, 49, 51–52, R. 264–66, 271, 273–74). Both state that she gets very scared and nervous around authority figures and that she does not handle stress very well at all. (*Id.* at 43, 50–51, R. 265, 272–73). As a result, she rarely leaves the house. (*Id.* at 38, R. 260). When she does go out to walk, she needs to stop and rest after walking less than half mile or after about 30 minutes. (*Id.* at 42, 50, R. 264, 272). Her husband reports that she gets very nervous and upset a lot, which affects her memory, task completion, concentration, ability to get along with others, and her talking. (*Id.* at 42, R. 264). They both note that easy frustration keeps her from paying attention most of the time; she follows written instructions about 50% of the time but she does not follow spoken instructions well because she "zones in and out." (*Id.* at 42, 50, R. 264, 272). These observations are substantiated by objective findings by her mental health providers throughout the record. (*See, e.g.,* Dkt. 9-9 at 60, R. 1082 ("she has been trying to color and crochet when she is feeling upset but mostly she has been laying around and resting"); *see also* Dkt. 9-7 at 127, R. 482 ("problem is just getting up and going"), 290, R. 645 (she struggles with "not

wanting to get out of bed," feeling "panic and feeling overwhelmed"), 304, R. 659 ("still kind of sleeping a lot, napping during the day")).

It is recognized in the Seventh Circuit that "[a] claimant with a chronic disease like bipolar disorder is likely to have better days and worse days, and even if half the time she is well enough that she could work, she still could not hold down a full-time job." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). Persistence at struggling through household chores does not necessarily mean a claimant can manage the requirements of the workplace; there is more flexibility with performing chores, and unlike an employee, the claimant is not held to a minimum standard of performance in doing so. *Lanigan*, 865 F.3d at 564 (reversing ALJ decision when ALJ did not include off-task time in RFC assessment, having relied too heavily on ability to do household chores and not enough on amount of time claimant needed to perform them because of his bipolar symptoms). It is true that "[s]ubjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022). The issue here, however, is that the ALJ did not consider many of the objective medical findings that aligned with Plaintiff's subjective complaints but ran contrary to his ruling. The undersigned thus finds the shortcomings in the subjective symptom analysis further counsel in favor of remand.

## V.    CONCLUSION

For the reasons detailed herein, the undersigned recommends that the ALJ's decision denying Plaintiff benefits be **REVERSED** and **REMANDED** for further proceedings.

Any objections to the Magistrate Judge's Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for such failure.

So **RECOMMENDED.**

Date: 12/22/2025

M. Kendra Klump
United States Magistrate Judge
Southern District of Indiana

Distribution:
All ECF-registered counsel of record via CM/ECF